UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

JOETTA G.,[1]

    *Plaintiff,*

v.                CIVIL ACTION No. 4:20-CV-133-MSD-DEM

KILOLO KIJAKAZI,[2]
Commissioner of Social Security,

    *Defendant.*

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Joetta G. ("Plaintiff") brought this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision by the Commissioner of the Social Security Administration ("Commissioner") to deny her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act") 42 U.S.C. §§ 1381-1383f. Plaintiff raises a single assignment of error in the decision by the Administrative Law Judge

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

("ALJ") that heard her claim, challenging whether substantial evidence supports the assessment of limitations imposed by her mental impairments in light of the state agency psychologists' prior administrative medical findings. The Commissioner argues that the Residual Functional Capacity ("RFC") analysis adequately accounts for the mental limitations found by the ALJ, and the medical evidence Plaintiff relies upon was not part of the RFC finding, nor required to be adopted by the ALJ.

This action was referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). The matter is now before the court on the parties' cross-motions for summary judgment. For the reasons stated below, I recommend that the court DENY Plaintiff's Motion for Summary Judgement, (ECF No. 18), GRANT Defendant's Motion for Summary Judgment, (ECF No. 20), and AFFIRM the Commissioner's decision.

## I. <u>Procedural History</u>

Plaintiff protectively filed an application for SSI benefits on of September 21, 2017, alleging a disability onset date of March 1, 2017. (R. at 110.) The reviewing state agency denied her claim at the initial stage and on reconsideration. (R. 143-47, 153-59.) Plaintiff requested a hearing before an ALJ, which took place on November 15, 2019, with Plaintiff represented by counsel. (R. at 32-57.) In a decision dated December 2, 2019, the ALJ concluded that Plaintiff was not disabled as defined by the Act and therefore

2

denied her claim for benefits. (R. at 15-27.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-6.) Plaintiff then filed this civil action for judicial review.

## II. **Factual Background**

Plaintiff was thirty-eight years old at the time of her alleged disability onset in 2017, and thirty-nine when she applied for SSI later that year. (R. at 110.) She graduated high school and previously worked as a meat packer and fast food crew member. (R. at 38, 214, 339.) Plaintiff has not worked since 2011 and testified during her ALJ hearing that she stopped working due to mental health issues. (R. at 40, 214.)

The Administrative Record contains evidence which long predates Plaintiff's filing date, including consultative examination reports from the Virginia Department of Rehabilitative Services in 2011 and 2013. (R. at 273-77, 279-83.) Because she has only applied for SSI benefits, she is not eligible for a retroactive award of benefits to before the filing date. Thus, these early records are only relevant to the extent they demonstrate the state of Claimant's disability shortly before or after the date she applied for benefits. See 42 U.S.C. § 1383(a)(1); 20 C.F.R. § 416.501 (limiting SSI benefits to the month following the filing date).

A.      **Opinion Evidence**

*Consultative Examinations in 2011 and 2013*

On September 2, 2011, six years before Plaintiff's present application for benefits, Glenn Shean, Ph.D. conducted a psychological examination of Plaintiff and diagnosed her with dysthymic disorder, schizotypal personality disorder, and back pain in the lumbar region. (R. at 273-77). After considering Plaintiff's medical, social, legal, and employment history, Dr. Shean found that Plaintiff should be able to perform simple, routine tasks. (R. at 276). However, Dr. Shean noted that she may lack motivation to maintain regular attendance in the workplace, would require special supervision in order to maintain work activities on a consistent basis, would not be able to interact appropriately with the public, and would not be able to deal with stresses encountered in a competitive work environment unless the work involved relatively isolated routine tasks. (Id.)

On August 19, 2013, Dr. George L. Fenigsohn, Ed.D., performed a second psychological consultative examination, considering Plaintiff's medical, social, legal, and employment history. (R. at 279-82.) Dr. Fenigsohn noted that Plaintiff was studying medical administration at a community college. (R. at 281.) While Dr. Fenigsohn considered Plaintiff to be capable of more than simple and repetitive tasks, he cautioned that unless Plaintiff received proper medication and therapy for a lengthy period and obtained

4

marketable skills, her prognosis was not favorable and progress was problematic. (Id.) Further, Dr. Fenigsohn opined that Plaintiff's attitude, social paranoia, frustration tolerance, and impaired coping skills would make it difficult for Plaintiff to succeed in a competitive work environment. (Id.) Plaintiff reported to Dr. Fenigsohn that she wanted employment in an office with a quiet environment, however, Dr. Fenigsohn considered that her past difficulties including a violent felony "ma[d]e this somewhat doubtful." (Id.) Dr. Fenigsohn diagnosed Plaintiff with depressive disorder, schizotypal personality disorder, antisocial and borderline risks, and personality disorder. (R. at 280.)

*Mental Status Evaluation with Dr. Galer in December 2017*

On December 21, 2017, more than four years after her examination by Dr. Fenigsohn, Plaintiff underwent a consultative mental status evaluation with Allison Galer, Psy.D., during which Plaintiff described suffering emotional symptoms, sleep impairment, and recurrent low moods. (R. at 338-42.) According to Dr. Galer, Plaintiff evidenced "odd beliefs with themes of prosecution and spiritual warfare," and alleged that a woman stole Plaintiff's identity and regularly harassed her when she left the house. (R. at 339-40.) Plaintiff was experienced as friendly, though her thought process was odd, tangential, and constantly strayed. (R. at 340.) Her insight and judgment appeared fair. (Id.)

5

Dr. Galer diagnosed Plaintiff with schizotypal personality disorder, depressive disorder, and anxiety disorder; considered her prognosis for improvement to be fair; and recommended that Plaintiff continue treatment via medication management and psychotherapy. (R. at 341.) Plaintiff's symptoms were chronic and stable, and Dr. Galer opined that Plaintiff was able to complete all age-appropriate self-care skills independently including reading, writing, managing money, cooking, bathing, toileting, dressing, eating, using a computer, and completing chores. (R. at 339-40.) Dr. Galer also found that Plaintiff was oriented to person, place and time, and that Plaintiff's attention and concertation likely fell in the average range based on her abilities on Digit Span forward, Digit Span backward, and serial 8's. (R. at 340.) Plaintiff's remote memory, recent memory, and overall cognitive function were observed to be intact, and her intellectual function was estimated to be in the average range. (Id.)

Dr. Galer submitted that Plaintiff could perform moderately complex tasks as well as simple and repetitive tasks, maintain regular attendance in the workplace, perform work activities on a consistent basis, not require special or additional supervision, and readily accept instructions from supervisors. (R. at 341.) However, Dr. Galer cautioned that Plaintiff would likely experience paranoid thought content with ideas of reference during

6

work, that she should not interact with the public, and that she would likely experience increased symptoms of paranoia when stressed. (R. at 341-42.)

Plaintiff reported being unemployed since 2011, when she claimed to have been let go from McDonald's due to her criminal history. (R. at 339.) She also claimed to have not sought employment since that time due to back pain and mental health instability and indicated that she previously had difficulty finding employment because of her legal history. (Id.)

*Disability Determination Explanation from December 2017*

On December 28, 2017, state agency psychologist Daniel Walter, Psy.D., LCP, examined Plaintiff's record and opined that she had no limitation in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, and pace; and mild limitations in adapting or managing herself. (R. at 116.) Dr. Walter considered Plaintiff's statements about her symptoms to only be partially consistent. (R. at 117). Specifically, he questioned whether her statements were disproportionate to the severity and duration that would be expected based on her medically determinable impairments, noting that Plaintiff was not limited with performing her activities of daily life and that she could do simple and repetitive tasks with limited contact with other people. (R. at 116-17).

In Dr. Walter's assessment of Plaintiff's concentration and persistence limitations, he found moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 120.) He found no significant limitations in Plaintiff's abilities to carry out very short and simple instructions or detailed instructions, maintain attention and concentration for extended periods, and make simple work-related decisions. (Id.)

In Dr. Walter's assessment of Plaintiff's social limitations, he found marked limitations in her ability to interact appropriately with the general public and moderate limitations in her abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Id.) Dr. Walter also opined that mood and personality issues would make contact with others difficult. (Id.)

8

*Reconsideration of Disability Determination Explanation from August 2018*

On August 7, 2018, state agency psychologist Richard J. Milan, Jr., Psy.D., examined Plaintiff's record and determined that Dr. Walter's administrative medical finding was supported by, and consistent with the evidence on file.  (R. at 133, 138.)  In Dr. Milan's assessment of Plaintiff's concentration, persistence, and pace impairments, he found moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 137.)  He found no significant limitations in Plaintiff's ability to carry out very short and simple instructions or detailed instructions, maintain attention and concentration for extended periods, and make simple work-related decisions.  (Id.)  Dr. Milan explained that mood and personality issues would make contact with others difficult.  (Id.)  Further, he asserted that Plaintiff was capable of attending to tasks for two-hour periods with usual breaks, although there would be occasional interruptions.  (Id.)

In Dr. Milan's assessment of Plaintiff's social limitations, he found marked limitations in her ability to interact appropriately with the general public and moderate limitations in her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Id.) Dr. Milan also opined that mood and personality issues would make contact with others difficult. (Id.)

*Medical Source Statement from Plaintiff's Treating Psychiatrist*

On June 17, 2019, Plaintiff's treating psychiatrist, Dr. Sandhya Rajasekhara, M.D., reviewed Plaintiff's updated record and completed a Medical Source Statement assessing her level of impairment for work-related activities. (R. at 450.) Dr. Rajasekhara indicated that Plaintiff had an extreme limitation in her ability to deal with normal work stress; marked limitations in her ability to carry out short and simple instructions, maintain concentration and focus, perform at a consistent pace, and respond to changes in routine; a marked-to-moderate limitation in her ability to get along with the general public; and a mild limitation in her ability to get along with supervisors. (Id.)

B.    **The ALJ Hearing**

Plaintiff appeared with counsel at the November 15, 2019 hearing before the ALJ, where she testified regarding her work history and mental health issues.   (R. at 37-49.)   Plaintiff described her primary mental health symptoms as anxiety, depression, and paranoia, which she experienced at least twice per week.   (R. at 41-45.)   These symptoms tended to be exacerbated by interacting with other people.   (Id.)   Additionally, Plaintiff testified that she has a good relationship with her treating psychiatrist, Dr. Rajasekhara, who prescribed her Seroquel and Wellbutrin.   (R. at 45-47.)

Plaintiff submitted an accompanying Function Report that described her daily activities and responsibilities.   (R. at 224-31.)   Plaintiff reported that she took care of her son by preparing his meals, taking him to the school bus, and making sure that he dresses himself.   (R. at 225.)   She also cleaned her house twice per week; shopped for food, toiletries, clothes, and cleaning items; took the bus daily in order to run errands; and managed her finances.   (R. at 226-28.).   Socially, Plaintiff enjoyed watching TV, playing games, and talking on the phone because those activities did not require face-to-face interaction.   (R. at 228.) Her regular in-person activities included attending church weekly, shopping twice a week, and mental health counseling appointments two or three times a week.   (Id.)   She did not talk to family and

had limited friends due to past hurtful situations and trust issues. (R. at 229.) Additionally, Plaintiff asserted that she was only able pay attention for 30-45 minutes at a time, that she got along well with authority figures, and that she did not handle stress well. (R. at 229-30.)

The ALJ also heard testimony from a vocational expert ("VE"). (R. at 49-55.) The VE characterized Plaintiff's prior work as both a packer and box-maker as medium and unskilled. (R. at 50.) The ALJ's hypothetical for the VE posited a person of the same age, education, and work experience as Plaintiff with the following limitations:

> [L]imited to light exertion; frequently using foot
> controls with bilaterally lower extremities; frequent
> balancing, stooping, kneeling, crouching; occasional
> crawling and climbing ramps and stairs; never climbing
> ladders, ropes, or scaffolding; never exposure to hazards
> such as unprotected heights or dangerous moving
> mechanical parts; limited to occasional interaction with
> supervisors, co-workers, and the public; limited to
> performing simple, routine tasks, but not a production
> rate pace such as assembly line work.

(R. at 51.) The VE testified that jobs would be available to such a person, identifying cleaner (DOT 323.687-014) with 50,000 jobs nationally; router (DOT 222.587-038) with 40,000 jobs nationally; and stock checker (DOT 299.667-014) with 20,000 jobs nationally. (R. at 51-52.) Further, if "no public interaction" were an added limitation, there would be no change in positions or job numbers. (R. at 52.) The VE also stated that if the above hypothetical was

12

modified to have a sedentary exertion level, jobs would still be available to such a person, identifying addresser (DOT 209.587-010) with 10,000 jobs nationally; document preparer (DOT 249.587-018) with 20,000 jobs nationally; and final assembler (DOT 713.687-018) with 10,000 jobs nationally. (R. at 52.)

Following an additional query by the ALJ, the VE testified that no jobs would exist in the national market under the sedentary hypothetical if the person had the following additional limitations: regularly absent from work two or more times per month; occasionally unable to interact appropriately with supervisors and coworkers; occasionally unable to respond or adapt appropriately to usual work situations or changes in a routine work setting; or occasionally unable to understand, remember, carry out simple instructions, and make judgments on simple work-related decisions. (R. at 52-53.) This hypothetical was at least in part based on Dr. Rajasekhara's Medical Source Statement, which the ALJ ultimately found unpersuasive. (Id. (referring to R. at 450); R. at 22.)

On cross-examination by Plaintiff's counsel, the VE testified that if the person in the above hypotheticals were to have any pattern of being absent from work two or more times per month, or consistently showing up late for work unscheduled, leaving early unscheduled, or requiring up to about fifteen percent extra

supervision, no jobs would exist in the national market.  (R. at 54-55.)

### III. <u>Standard of Review</u>

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the Commissioner applied the proper legal standard in evaluating the evidence. <u>See</u> 42 U.S.C. §§ 405(g), 1383(c)(3); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. of N.Y. v. NLRB</u>, 305 U.S. 197, 229 (1938)). It may be less than a preponderance of evidence but is more than a "mere scintilla." <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's]

designate, the ALJ)." Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. 42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390. Reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   Analysis

Plaintiff's brief identifies a single error in the ALJ's decision that she claims warrants remand. She contends the ALJ's RFC did not account for moderate limitations recited in the opinions of the reviewing psychologists regarding maintaining punctuality, regular attendance, and performing tasks without special supervision. Mem. Supp. Pl.'s Mot. for Summ. J. 6-10 (ECF No. 19) ("Pl.'s Mem."); Pl.'s Reply to Def.'s Mot. for Summ. J. 1-3 (ECF No. 22) ("Pl.'s Reply"). As explained below, this report finds no error in the ALJ's analysis of the medical evidence – including the consulting examiners' opinions Plaintiff relies upon. Accordingly, the report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

A.    **Framework for SSA Disability Evaluation**

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)).  As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A)); accord 20 C.F.R. § 416.905(a).  An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.   Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.   Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.   Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 4:16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d

517, 520 (4th Cir. 1967)).   Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

## B.   The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 21, 2017, the alleged disability onset date.   (R. at 17.)   The ALJ next identified several severe impairments: lumbar degenerative disc disease, bilateral knee degenerative joint disease, obesity, borderline behavior disorder, schizotypal personality disorder, depressive disorder, and anxiety.   (R. at 18.)   At step three, the ALJ concluded that Plaintiff did not have an impairment or a combination of impairments that met or exceeded the requirements of any listed impairment.   (R. at 18-20.)

Having reached step four, the ALJ set out Plaintiff's RFC:

[C]laimant has the residual functional capacity to perform light work . . . except the claimant can frequently use foot control with her bilateral lower extremities. The claimant is limited to frequent balancing, stooping, kneeling and crouching, however, she can only occasionally crawl and climb on ramps and stairs and can never climb on ladders, ropes or scaffolds. The claimant can have no exposure to hazards such as unprotected heights and dangerous moving mechanical parts. She is further limited to simple routine tasks, but not performed at a production rate pace such as assembly line work. Moreover, the claimant is limited to occasional interaction with supervisors and coworkers and she can have no interaction with the general public.

18

(R. at 20.)   Using this RFC, the ALJ concluded that Plaintiff was unable to perform her past work. (R. at 25.)   Finally, at step five, the ALJ determined that, based on the testimony of the VE and the ALJ's own consideration of the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpart P, App. 2, Plaintiff could adjust to other work that existed in significant numbers in the national economy.   (R. at 26.)   He therefore entered a finding that Plaintiff was "not disabled."   (R. at 27.)

C.   **The functional limitations which the ALJ found were imposed by Claimant's mental impairments are adequately addressed by her RFC.**

If an ALJ's five-step analysis reaches step four, the ALJ will first make a finding on the claimant's RFC using all relevant evidence, medical and otherwise. 20 C.F.R. §§ 416.920(e), 416.945. A claimant's RFC is the most an individual can do despite the physical and mental limitations on his or her ability to do work. Lewis v. Berryhill, 858 F.3d 858, 861-62 (4th Cir. 2017).   Residual capacities "must be expressed in terms of work-related functions" when assessing a claimant's RFC. SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996).

Plaintiff does not address in detail the ALJ's evaluation of the medical evidence in the record and his resulting conclusions regarding the limits imposed by her mental impairments, as set forth in his RFC findings.   Instead, she argues narrowly that because the ALJ partially credited Dr. Walter and Dr. Milan's

consulting psychological opinions, and because those reviewers described moderate limitations in maintaining attendance and punctuality, dressing appropriately, and performing tasks without special supervision, that each of these limits must be separately addressed in the resulting RFC. As the ALJ's RFC fails to account for those alleged limitations when it limited her to "simple routine tasks, but not at a production rate pace, such as assembly line work; occasionally interaction with co-workers and supervisors; and no interaction with the general public," Plaintiff argues that remand is required. Pl.'s Mem. 6 (ECF No. 19).

This argument mistakenly equates the ALJ's finding that the opinions of Dr. Walter and Dr. Milan were partially persuasive, with his RFC assessment. In partially crediting their opinion testimony, the ALJ does not adopt all of the limitations they described under Section I of the Mental Residual Functional Capacity ("MRFC") Assessment from the Disability Determination Explanation Form. The worksheet from Section I of the MRFC is intended to force expert reviewers to consider a claimant's ability to engage in an array of work-related functions. _Stephens v. Colvin_, No. 3:14-CV-25232, 2015 WL 7301684, at *16 (S.D.W. Va. Oct. 26, 2015), report and recommendation adopted, 2015 WL 7302768 (S.D.W. Va. Nov. 18, 2015). "The ALJ is under no obligation to accept the 'check-box conclusions' found in Section I of the Mental

20

RFC form." Pippen v. Astrue, No. 1:09CV308, 2010 WL 3656002, at

*6 (W.D.N.C. Aug. 24, 2010), report and recommendation adopted,

2010 WL 3655998 (W.D.N.C. Sept. 15, 2010). Rather, the narrative

portion of the report in Section III is intended to be the experts'

RFC opinion. Stephens, 2015 WL 7301684, at *16. The Social

Security Program Operations Manual System (POMS) instructs:

> Section I [of the MRFC] is merely a worksheet to aid in
> deciding the presence and degree of functional
> limitations and the adequacy of documentation and does
> not constitute the RFC assessment . . . . Section III—
> Functional Capacity Assessment, is for recording the
> mental RFC determination. It is in this section that the
> actual mental RFC assessment is recorded, explaining the
> conclusions indicated in section I, in terms of the
> extent to which these mental capacities or functions
> could or could not be performed in work settings.

POMS § DI 24510.060(B)(2)(a) & (4)(a),

https://secure.ssa.gov/poms.nsf/lnx/0424510060 (last visited July

15, 2021) (boldface omitted) (emphasis added); see also Ritchie v.

Astrue, No. 2:11CV00012, 2012 WL 4458208, at *2 (W.D. Va. June 26,

2012) ("[I]n formulating the RFC assessment, the ALJ properly

relied upon the psychologists' conclusions as stated in Section

III of their forms . . . [and] did not err in omitting the

additional limitations described in Section I of the form.")

(citing Berry v. Astrue, No. 1:08-cv-00005, 2009 WL 50072, at *14-

15 (W.D. Va. Jan. 7, 2009)); Taylor v. Astrue, No. 5:1O-CV-263-

FL, 2011 WL 1599679, at *11-12 (E.D.N.C. Mar. 23, 2011), report

and recommendation adopted, 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

Both Dr. Walter and Dr. Milan used their Section I worksheets to describe moderate effects on attendance or supervision resulting from Plaintiff's mental impairments, which the ALJ partially credited.  But neither referenced such limits in their narrative explanation of Plaintiff's RFC resulting from these limitations.  Both used the narrative portion in Section III of their opinion to state their conclusion that "[m]ood and personality issues would make contact with others difficult."[3] (R. at 120, 137).

The ALJ properly considered these opinions and all of the other relevant evidence of mental limitations when formulating Plaintiff's RFC.  The ALJ found that Plaintiff's ability to concentrate, persist, or maintain pace was moderately limited, but observed that she takes care of her son, cooks, and cleans; goes out by herself and goes shopping in stores without difficulty; and counts change and handles her personal finances without difficulty.  (R. at 19-20.)  This, along with the other evidence cited in the RFC analysis, including evidence that Plaintiff's attention and concentration were likely in the average range based

---

[3] Dr. Milan also opined in Section III that Plaintiff "can attend to tasks for two-hour periods with usual breaks, if with occasional interruptions." (R. 137-38.)  This is consistent with the agency's definition of customary breaks. See SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996) (noting that breaks occur at approximately 2-hour intervals).

on her ability to count backwards and forwards and do serial 7's, led him to conclude the RFC limits he imposed were adequate. (Id.)

Among the evidence cited in his opinion, the ALJ considered treatment records from Plaintiff's treating psychiatrist, Dr. Rajasekhara, which found Plaintiff's "mental status to be within the normal limits." (R. at 22 (citing R. at 344, 445-46, 448-49).) During a February 2019 appointment, Plaintiff reported to Dr. Rajasekhara that she was doing okay and that the medications were helping her. (Id.) (citing R. at 446).) While Dr. Rajasekhara noted that Plaintiff appeared anxious, she found Plaintiff's thought process to be clear, coherent and goal directed and her insight and judgement to be fair. (Id.) (citing R. at 448).) Six months later, in August 2019, Dr. Rajasekhara again reported Plaintiff's thought process as clear, coherent, and goal directed; her insight and judgment as fair; and her testing to be within normal limits. (Id.) (citing R. at 449)).

The ALJ was not persuaded by Dr. Rajasekhara's separate medical source statement from June 2019, which opined that Plaintiff had an extreme limitation in her ability to deal with normal work stress; a marked limitation in her ability to carry out short and simple instructions, maintain concentration and focus, perform at a consistent pace, and respond to changes in routine; a marked-to-moderate limitation in her ability to get along with the general public; and a mild limitation in her ability

23

to get along with supervisors.  (R. at 22 (citing R. at 450).)  As the ALJ noted, this assessment was not supported by Dr. Rajasekhara's own mental health status examinations which failed to support such marked or extreme limits.  (Id.)  Likewise, the opinion conflicted with the narrative opinions of Dr. Walter and Dr. Milan discussed above, which the ALJ found partially credible.

The ALJ also found Dr. Galer's opinion regarding Plaintiff's cognitive functioning and concentration, persistence, and pace to be partially persuasive, as it was generally supported by the consultative examinations and consistent with her medical records, including the above records from Dr. Rajasekhara.  (R. at 22-23.) The ALJ gave weight to Dr. Galer's opinion that Plaintiff would be able to perform moderately complex tasks as well as simple and repetitive tasks; maintain regular attendance in the workplace and perform on a consistent basis, even if she would likely experience paranoid thought content during a normal work day/week; and cooperate and readily accept instructions from supervisors.  (Id.) However, the ALJ did not find Dr. Galer's opinion that Plaintiff should not interact with the public to be persuasive because it was not defined in occupational terms and because both the consultative examination and treatment records showed that Plaintiff's ability to interact with others is "essentially mildly to at worst moderately effected."  (R. at 23.)

24

After considering all this evidence, the ALJ crafted a detailed hypothetical which accounts for the limitations he found. Among the specific restrictions directed to her moderate mental limitations, the hypothetical provided that she would be limited to simple, routine tasks. (R. at 20.) She must avoid fast-paced tasks such as assembly line jobs involving production quotas;[4] have only occasional, brief superficial interaction supervisors and co-workers; have no interaction with the general public; and avoid dangerous machinery and unprotected heights. (Id.) Notably, these limitations are precisely those addressed in Section III of Dr. Walter and Dr. Milan's MRFC, which opined that contact with others would be difficult but that Plaintiff could attend to tasks for two-hour periods with usual breaks, if with occasional interruptions. See (R. at 20, 120, 137-38).

An ALJ is entitled to credit the opinions of non-treating physicians that are consistent with the entire record. See 20

---

[4] Mascio established that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence or pace." 780 F.3d at 638. After Mascio, such limits were sometimes addressed by restricting the claimant to "non-production work," but the Fourth Circuit has since held that terms like "production rate" or "demand pace" were sometimes too vague standing alone to satisfy the ALJ's obligation to create a "logical bridge" between the evidence and the RFC limits. Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019). Here, however, the ALJ's RFC is more detailed, and specifically supported by the medical records he relied on and cited in his Opinion. Plaintiff's only challenge to the RFC relates to her ability to maintain attendance and perform tasks without special supervision.

C.F.R. § 416.913a(b)(1) (requiring ALJs to consider, but not necessarily adopt, prior administrative medical findings); see also Bewley v. Berryhill, No. 2:17-cv-643, 2018 WL 7017995, at *7-8 (E.D. Va. Sept. 24, 2018) (affirming ALJ opinion that credited state agency consultant's opinion over treating physician's opinion in light of the latter's inconsistency with the record evidence), report and recommendation adopted, 2018 WL 6323072 (E.D. Va. Dec. 4, 2018). Here, the ALJ acknowledged that while Plaintiff faces some limitations in performing her activities of daily living, those activities – including taking care of her son, cooking, cleaning, using public transportation, shopping, talking on the phone – considered in conjunction with her medical evidence of record, suggest that Plaintiff can perform work within the parameters of her restrictive RFC. (R. at 24.)

There is no per se rule regarding how the RFC needs to accommodate particular functional limitations. Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020.) The inquiry requires a reviewing court to consider both the analysis of medical evidence in the record and the resulting limitations. Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017) (rejecting Mascio argument and affirming Commissioner where ALJ's detailed medical findings provided substantial support for the RFC limitations). See also Eastwood v. Colvin, No. 3:15-cv-156, 2016 WL 805709, at *4 (E.D. Va. Feb. 12, 2016) (holding ALJ accommodated claimant's

concentration and pace limitations by limiting her to (1) few workplace changes; (2) little independent decision-making; and (3) less than an assembly line pace); Hunter v. Berryhill, No. 3:17-cv-112, 2018 WL 310138, at *13 (E.D. Va. Jan. 5, 2018) (finding ALJ complied with Mascio by limiting claimant to "simple, routine tasks, not at production rate, where she has no more than occasional changes in routine work setting, occasional contact with supervisors . . . and no interaction with the public").

Here, the ALJ properly related the medical evidence to Plaintiff's ability to function in the workplace as required under Mascio. And his detailed, highly restrictive RFC adequately accounts for the limitations imposed by her mental impairments. While the ALJ found Dr. Walter's and Dr. Milan's observations from Section I of the MRFC to be credible in his step four findings – including their finding that Plaintiff's ability to complete a normal workday/week was moderately impaired – that finding does not require any particular restriction be enumerated in her RFC. See Stephens v. Colvin, No. 3:14-cv-25232, 2015 WL 7301684, at *16 (S.D. W. Va. Oct. 26, 2015); Pippen v. Astrue, No. 1:09cv308, 2010 WL 3656002, at *6 (W.D.N.C. Aug. 24, 2010). Rather, the ALJ's opinion synthesizes many medical opinions, as well as Plaintiff's subjective statements about her activities of daily life, which includes evidence suggesting that Plaintiff's attendance limitations may only be mildly impaired. See, e.g., (R. at 22

(describing Dr. Galer's finding that Plaintiff could maintain regular attendance in the workplace and perform on a consistent basis)); (R. at 24 (describing Plaintiff's routine of taking care of her son every day and completing daily to weekly tasks including shopping and laundry)). The ALJ in this case also imposed an RFC that accounts for Plaintiff's mental impairments by limiting Plaintiff to routine tasks, no interaction with the general public, and limited interaction with supervisors and co-workers. These accommodations are not – as Plaintiff argues – solely intended to accommodate other mental limitations. Rather they mitigate the variety of mental limitations which the ALJ concluded would limit Plaintiff's ability to work. And they directly address the RFC opinions expressed in narrative form by both Dr. Walter and Dr. Millan, by describing the type of work that someone with those limitations would be able to pursue.

This report therefore finds no error in the RFC determination. The ALJ properly considered both the objective medical evidence and Plaintiff's subjective statements regarding her symptoms, and properly reconciled conflicting evidence in reaching his conclusion. His detailed RFC findings adequately accommodate the functional limitations caused by her mental impairments. Accordingly, his opinion is supported by substantial evidence, and Plaintiff's challenge does not warrant remand.

## V.   Conclusion

For the foregoing reasons, I recommend that the court DENY Plaintiff's Motion for Summary Judgement, (ECF No. 18), GRANT Defendant's Motion for Summary Judgment, (ECF No. 20), and AFFIRM the final decision of the Commissioner.

## VI.   Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above

will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia

August 6, 2021